[No. C004213. Third Dist. Mar. 29, 1990.]

CHAMPION HOME BUILDERS CO., Plaintiff and Respondent, v. PHIL S. SIPES et al., Defendants and Appellants.

**COUNSEL**

Douglas H. Drake for Defendants and Appellants.

David A. Riegels, Sue Ellen Wooldridge and Diepenbrock, Wulff, Plant & Hannegan for Plaintiff and Respondent.

## OPINION

CARR, J.—The primary issue in this appeal concerns the assignability of certain personal guaranties executed by Phil S. Sipes and Carol Sipes, defendants and appellants herein.

Defendants operated several recreational vehicle dealerships which they stocked with units manufactured by plaintiff. Defendants failed to forward sales proceeds to pay for the inventory as agreed. Plaintiff then obtained judgment against defendants for breach of contract and conversion. Defendants appeal, asserting the personal guaranties upon which the breach of contract action was brought were not assigned to plaintiff; no basis for a conversion cause of action existed or was proven, and the court erroneously refused to admit evidence of the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Champion Home Builders Co. (Champion), filed suit against Lodi R.V. Center, Inc., doing business as the RV People and Sacramento R.V. Center, and Phil Sipes and Carol Sipes, president and secretary respectively of Lodi R.V. Center, Inc. The action sought $381,302.35 plus interest due in the sale of 10 motor homes sold by Champion to Lodi R.V. Center, Inc. These motor homes were subject to security agreements but were sold by Lodi R.V. Center, Inc., to retail customers without payment to Champion from the sales proceeds. After Lodi R.V. Center, Inc., went into bankruptcy, Champion proceeded only against the individual defendants, Phil and Carol Sipes, on causes of action for breach of the security agreements executed by Lodi R.V. Center for which the Sipeses had executed personal guaranties, and for conversion. After trial by the court, judgment was entered against Phil Sipes on both the breach of contract and conversion causes and against Carol Sipes for breach of contract only. At trial the only witnesses were Phil Sipes and Sam Gatson, a credit and collections coordinator for plaintiff.[1]

---

[1] Certain terms are here defined to better understand the transactions. "Sold and unpaid" refers to a vehicle delivered to the consumer for which the money has not been received. "Sold out of trust" refers to a vehicle delivered to the consumer for which the money has been received by the dealer but not transferred to the manufacturer or its finance company. Vehicles are deemed sold and unpaid until a decision is made that they are in fact sold out of trust.

Champion manufactures motor homes and recreational vehicles (RVs) under several different trade names. Champion Credit Corporation (Champion Credit) is a separate company which handles financing for the dealers purchasing Champion's vehicles.

Prior to Champion Credit's handling of the dealer financing, this financing was done by Finance America Private Brands, Inc. (Finance America). In March 1983, December 1983, January 1984, and February 1984, Lodi R. V. Center, Inc., entered into written security agreements with Finance America which gave Finance America a security interest in all of Lodi R. V. Center, Inc.'s present- and after-acquired inventory and all proceeds therefrom. Lodi R. V. Center, Inc. also promised in these agreements to pay to Finance America upon the sale of any vehicle the amount of its obligation to Finance America allocable to the sold vehicle.

In March 1983, and twice in December 1983, Phil and Carol Sipes executed personal guaranties to Finance America whereby each promised to pay "any and all indebtedness" incurred by Lodi R. V. Center, Inc., which included "any and all advances, loans or other financial accommodation heretofore or hereafter" granted to Lodi R. V. Center, Inc., or its account. Subsequently, there was a corporate changeover, from Finance America to Champion Credit, either by a name change or by a sale of assets.[2] There was no express written assignment of the personal guaranties executed by the Sipes.

Champion does business in the following manner: It extends lines of credit to its dealers. It has various plants which produce different models. When a dealer wants a vehicle or when a plant wishes to dispose of a vehicle it calls Champion to place it on a dealer's "floor plan." If the dealer's line of credit is sufficient, Champion gives approval and the vehicle is shipped to the dealer. Champion Credit then sends Champion a check for the amount of the vehicle. Dealers are charged interest for the vehicles at the prime rate plus 2 percent. As a penalty for sales out of trust dealers are charged prime plus 4 percent. At the end of a year the vehicle must be paid off or the penalty interest is charged. Champion Credit sends a monthly statement of account to each dealer with a copy to Champion.

---

[2] There was some testimony this was more than a name change. Apparently Bank of America owned Finance America, and Chrysler Corporation owned Champion Credit. Gatson did not know if there had been a sale which resulted in the name change. Phil Sipes testified there was an actual sale of assets.

The trial court found "Nor is there any doubt that Champion Credit Corporation succeeded to the interest of Finance America, whether that company underwent a mere change of name or sold its assets."

Phil Sipes has been the president of Lodi R.V. Center, Inc. (Lodi), since it was formed in 1981. Carol Sipes was the secretary-treasurer. Lodi operated several RV sales centers and defendants had had experience in RV sales since 1978. Defendant Phil Sipes signed the company's checks after his wife prepared them. He signed the security documents in question. He intended to be personally responsible should Lodi not pay the manufacturer for the RVs. He conceded the dates and prices at which the 10 motor homes were sold by Lodi. He understood that Champion Credit or Finance America was entitled to be paid when the RVs were sold. Instead the sales proceeds were used for general business purposes of Lodi. Champion Credit was not paid "I guess because the corporation didn't have the money" and not because of a dispute. Phil Sipes was responsible for this decision. He spoke with Champion Credit in December 1984 and January 1985 and said he was about to get a loan and and pay for the RVs then. After those conversations he continued to sell RVs and did not pay for them.[3] He claimed to have spoken with Jeff Buecking of Champion Credit who agreed to "let this ride" and merely charge him interest on the outstanding balance. He could not recall any conversation occurring before any sales which authorized him to pay just the interest. Defendant Phil Sipes's business was adversely affected when a commercial airplane crashed into his Reno lot on January 21, 1985, destroying several motor homes and killing some of his employees.

On November 13, 1984, Champion Credit sent a letter to Lodi which requested payment for three sold and unpaid units. On January 3, 1985, Champion Credit sent another letter listing sold and unpaid charges for Lodi, Sacramento RV, and The RV People totalling over $200,000. In a letter dated February 21, 1985, Champion Credit lists "units currently S.O.T." and the charges and states: "Per our conversation today, we must receive these current charges no later than 2/28/85 to maintain your present line of credit. Failure to pay your charges by this date would result in the fifth consecutive month with delinquent charges." Copies of each of these letters were sent to Champion.

Gatson testified he first met Phil Sipes in late February or early March 1985. After he told him there were out of trust RVs, Phil Sipes paid one off and made a commitment to pay off the others.

On March 25, 1985, Gatson seized the Sipeses' inventory and they released their interest in the remaining RVs to Finance America. According

---

[3] He sold six of the vehicles between February 24 and March 17, 1985.

to Champion's records the Sipes should have had 57 RVs on the lot but only had 47 RVs.[4]

After the remaining RVs were seized, Champion paid Champion Credit for the 10 RVs sold as Champion was obligated to make good when a dealer defaulted. In exchange Champion Credit assigned its rights against the Sipeses to Champion. There was no express assignment of the guaranties. In April 1985 Champion received the original guaranties and "the entire document package signed by the dealer upon their inception as a dealer to Champion Credit."

## DISCUSSION

### *I. The guaranties were validly assigned to plaintiff.*

The primary defense asserted at trial and on appeal is the personal guaranties defendants executed in favor of Finance America were nonassignable. The trial court held they were assignable because "they are not personal in nature and have no restriction against assignment."

■ The Sipeses contend the court erred because as a matter of law the guaranties were personal. This argument is based on the following passage in the guaranties: "[defendants] jointly and severally unconditionally guarantee and promise to pay *you* on demand any and all indebtedness of Dealer as may be owing to *you*. . . . *The words 'you' and 'your' as used herein shall mean and include you and your subsidiaries and affiliates, and this Guaranty shall apply in favor of and be enforceable by you and each of your subsidiaries and affiliates.*" (Italics added.) The use of the word "you" means, according to the Sipeses, that the guaranty was personal. They are mistaken. Assignability is presumed and the mere use of "you" does not constitute a " 'plain intent to restrict the guarantors' liability to the original creditor.' " (*Thorpe* v. *Story* (1937) 10 Cal.2d 104, 118-119 [73 P.2d 1194]. See *Bank of America* v. *Granger* (1931) 115 Cal.App. 210, 218-219 [1 P.2d 479]; *Murphy* v. *Luthy Battery Co.* (1925) 74 Cal.App. 68, 71-75 [239 P. 341]; *Reios* v. *Mardis* (1912) 18 Cal.App. 276, 279-280 [122 P. 1091].)

■ The Sipeses further contend the assignment of personal guaranties other than negotiable instruments as defined in California Uniform

---

[4] The handwritten release introduced as an exhibit below is attached to a typed list of 68 vehicles. Ten of these are the same as the vehicles allegedly sold out of trust. No explanation for the discrepancy is apparent from the record.

Commercial Code section 3104 must be assigned in writing.[5] "A transfer may be made without writing, in every case in which a writing is not expressly required by statute." (Civ. Code, § 1052.) The Sipeses assert a writing is required by Civil Code section 955 which provides in pertinent part: "A transfer other than one intended to create a security interest [ ] of a nonnegotiable instrument which is otherwise negotiable within Division 3 of the Commercial Code but which is not payable to order or to bearer [ ] shall be deemed perfected against third persons when such property rights have been endorsed or assigned in writing . . . ." Since assignments in writing were not produced at trial, the Sipeses contend this statute renders any assignment invalid. They are again wrong. As plaintiff notes this section merely establishes priority among creditors by providing for perfection of an interest on the doing of specified things. It does not invalidate interests not in writing.[6]

The Sipeses argue there was no substantial evidence supporting the court's finding of a valid assignment.[7] The trial court found: "Finance America sent a letter dated February 16, 1984 [ ] advising that all outstanding transactions had been sold to Champion Credit Corporation, with whom the defendants thereafter continued to conduct business, and Champion Credit Corporation held the instruments at the time the defendants defaulted. On April 4, 1985, Champion Credit Corporation assigned in writing to Champion Home Builders its interest in all the obligations of Lodi R. V. Center. Although the assignment did not specifically refer to the defendants' personal guarantees, they are included by operation of law unless there is a contrary intent, which was not proved. [Citation.] Accordingly, the Court finds that the personal guarantees were validly assigned to the plaintiff." The letter provided substantial evidence of a valid assignment between Finance America and Champion Credit.[8] Phil Sipes testified he

---

[5] That section lists the features which turn a writing into a negotiable instrument.

[6] The Sipeses' reliance on *Goodley* v. *Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389 [133 Cal.Rptr. 83] is puzzling at best. That case decided a legal malpractice claim could not be assigned because it is a personal claim. (*Id.* at p. 395.) At one point the court states: "If plaintiff has the right to maintain the within action said right can be based only on a written assignment." (*Id.* at p. 393.) However, the court was not holding assignments must be in writing, only that the pleadings before it alleged a written assignment. (See *id.* at pp. 391-392.)

[7] At the close of Champion's case the Sipeses moved for a "nonsuit" on the ground plaintiff had not established a "chain of control" over the guaranties, by which they meant plaintiff could not trace back the assignments to the original obligee, Finance America. The trial court denied the motion on the ground the guaranties followed the debt.

[8] The letter states in part: "Please be advised that as of February 24, 1984, all outstanding transactions you had with FinanceAmerica Private Brands for the floor planning of inventory purchased by you from Champion Home Builders Co. (and its subsidiaries and affiliates) were sold to Champion Credit Corporation. You should, therefore, make all future payments to Champion Credit; all future statements will come from Champion Credit. [¶] In addition,

knew he was expected to pay either Champion Credit or Finance America on sale of any RVs. The transfer of the debt from Champion Credit to Champion[9] included by operation of law the guaranty because the transfer of a thing transfers the incidents. (Civ. Code, § 1084. See *Humboldt M. Co.* v. *N. W. Pac. Ry. Co.* (1913) 166 Cal. 175, 180-181; *Thorpe* v. *Story, supra,* 10 Cal.2d at p. 124; *Ellison* v. *Henion* (1920) 183 Cal. 171, 174, 176.)

■ Finally, the Sipeses contend the obligations they incurred extend over only some of the RVs because of the dates of the various transactions. We do not reach this question because it was not tendered below. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.) ■ However, were we to consider the contention, we would reject it. As respondents point out, the guaranties covered the Sipeses' indebtedness as a whole, not the debt for each unit sold. The guaranties extended to "any and all indebtedness of Dealer as may be owing to you. [¶] This is a continuing Guaranty relating to any indebtedness, including that arising under successive transactions which shall either continue the indebtedness or from time to time renew it after it has been satisfied." A continuing guaranty (Civ. Code, § 2814) is designed to secure future transactions. (*Goldman* v. *Dangerfield* (1929) 101 Cal.App. 67, 75 [281 P. 400].) There is thus no basis for apportioning individual sales.

At oral argument defendants' counsel argued new "flooring agreements" covered eight of the vehicles. The documents to which he refers are new *security* agreements executed on March 5, 1984, and May 14, 1984. These are identical to the "old" security agreements executed between Lodi and Finance America except the secured party is Champion Credit. The security agreements give a "continuing security interest" in "All of Dealer's presently owned and hereafter acquired inventory, and all Proceeds thereof." Inventory is defined as all vehicles "acquired by debtor from Champion Home Builders Co." Nothing in these agreements can be read to terminate the continuing personal guaranties.

Champion had the right to sue on the full indebtedness.

---

FinanceAmerica Private Brands has assigned to Champion Credit all of the benefits of the Security Agreement previously entered into with you."

[9]This assignment is dated April 4, 1985, and provides: "For value received, Champion Credit Corporation does hereby sell, assign and transfer to Champion Home Builders without recourse and without any warranties or representations of any nature, all its right, title and interest in and to the obligations of Lodi R.V. [Center] Inc. (CA Corp) T/A Sacramento R.V. Center A/T/A The R.V. People. [Address] per the schedule attached hereto which shows outstanding balances and the security held therefor held by Champion Credit Corporation." The exhibit introduced below does not contain the schedule incorporated into this assignment.

## II. Champion had the right to sue for conversion.

The Sipeses' second main contention challenges the assignment of the chose in action for conversion.[10] We address this contention as we perceive the contention.

■ Reiterating the arguments rejected in part I, the Sipeses contend subdivision (a) of Civil Code section 955.1 requires assignments of choses in action to be in writing. That statute provides in relevant part: "[A] transfer other than one intended to create a security interest [ ] of any general intangible [ ] consisting of any right to payment and any transfer of accounts or chattel paper [ ] shall be deemed perfected as against third persons upon there being executed and delivered to the transferee an assignment thereof in writing." Again we point out that the issue of priority of creditors is irrelevant to the existence of a right. The assignment of the debt, whether or not in writing, carried with it the tort cause of action. (*National R. Co.* v. *Metropolitan T. Co.* (1941) 17 Cal.2d 827, 832-833 [112 P.2d 598].)

■ Defendants note the trial court rejected their argument on the ground Civil Code section 955 was relevant only as to third parties but argue: "the trial judge failed to recognize that the appellants, the Sipes, are the third parties, the assignor being the first party and the assignee being the second." Defendants Sipeses misperceive the law. The "third party" would be a subsequent assignee without notice of the earlier assignment. Defendant Sipeses are the obligors, not the innocent third parties.

## III. The evidence supports the finding of conversion.

■ Defendant Phil Sipes challenges the finding of conversion. He asserts there is no evidence he wrongfully disposed of the proceeds of the sales, apparently on the basis that there is insufficient evidence that he directed the distribution of the proceeds. Sipes himself answered this point at trial: "Q. That was the provision of the security agreement, was it not, that as soon as you sold that vehicle and received the sales price, that you were supposed to pay the financing company for the vehicle? [¶] A. Yes, sir." Phil Sipes admitted he had responsibility for distributing the sales proceeds and spent the money elsewhere.

Phil Sipes also contends he was entitled to defer handing over the proceeds as long as he paid interest on all sold and unpaid motor homes and

---

[10] Following plaintiff's opening statement defendants moved for a nonsuit on the ground a conversion chose could not be assigned. The court (citing *Staley* v. *McClurken* (1939) 35 Cal.App.2d 622 [96 P.2d 805]) denied the motion.

RVs. The trial court rejected this argument: "Mr. Sipes admitted that Champion Credit Corporation never agreed *in advance* that he could sell the units without remitting the sales proceeds. After discovering that they were sold out of trust, Champion Credit Corporation in accordance with its policy required interest payments at prime plus 4 percent, but it never consented to the sale out of trust itself." The testimony of Gatson supports the trial court's ruling. He testified that after one year the RVs accrue interest at prime plus four percent, as did RVs sold out of trust. This rate was considered a penalty. The court asked Phil Sipes if he had a conversation "in which you agreed that you could sell it without paying the purchase price, and in lieu of that, just pay interest at prime plus four percent. [¶] THE WITNESS: I don't believe there was a conversation like that. No."

There was substantial evidence supporting the court's conclusion Phil Sipes did not have the right to defer payment and the payment of interest was a penalty for his failure to hand over the proceeds.

*IV. Defendant Phil Sipes was not deprived of a valid defense.*

Defendant contends the court erroneously precluded him from introducing evidence of the defense of "jamming." Defense counsel questioned Gatson about the credit lines extended to Lodi. Attempting to counter a relevancy objection counsel stated the evidence was relevant to the defense of "jamming." This occurs when a manufacturer delivers unwanted RVs to the floor of a dealer, often on the "midnight express," i.e., at night. The alleged incentive for this is to enable the manufacturer to begin charging interest for the RVs. Champion's counsel observed Phil Sipes had testified he did not have any offsets. The court then demanded an offer of proof from Sipes's counsel since the "defense" was not specifically pleaded in the answer. Counsel responded his client would testify in October 1984 he told Champion he did not want any more unordered RVs delivered. The court elicited that Phil Sipes would testify he never asked for units to be taken back, offered them for sale, and actually sold some.

The court properly ruled this evidence irrelevant. As guarantors the Sipes's agreed "their obligation hereunder shall not be discharged, impaired or affected by: . . . any offsets, counterclaims or defenses (other than payment in full of the indebtedness and the performance of all Dealer's obligations) that Guarantors may or might have to their respective undertakings, liabilities and obligations hereunder, all of which are hereby waived by Guarantors; . . ." The offer of proof indicated the evidence would be in the nature of an offset which was waived by the guaranties. It therefore had no

tendency in reason to prove or disprove a material fact and was irrelevant. (Evid. Code, § 210.)

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Sparks, J, concurred.